IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MANUEL GAITAN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 1:24-cv-380 (RDA/LRV) |
| ) | |
| CHADWICK DOTSON, Director, Virginia ) | |
| Department of Corrections, ) | |
| ) | |
| Respondent. ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Respondent Chadwick Dotson's Motion to Dismiss. Dkt. 6. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter is now ripe for disposition. Considering the Motion together with the Petition (Dkt. 1) and Respondent's Brief in Support (Dkt. 8),[1] this Court GRANTS the Motion for the reasons that follow.

I. BACKGROUND

The Court of Appeals of Virginia,[2] and the parties, summarize the facts of this case as follows:

> Sarah Marin-Barrera (Sarah) and appellant are the parents of Sarah's youngest child, A.G., who was five years old at the time of trial. Sarah has two other children, C.M., who was nine years old at the time of trial and A.M., who was eleven years old at the time of trial. In July of 2016, Sarah and her three children lived in an apartment in Prince William County with Jose Juan Portillo Argueta (Juan), whom she described as her "best friend," "roommate," and the family's provider. She

---

[1] Despite being afforded the opportunity to respond to Respondent's Motion and being represented by counsel, Petitioner has declined to do so. Dkts. 4, 10.

[2] The Court notes that, although this District Judge previously sat on the Court of Appeals of Virginia, this District Judge was not on that court at the time of this appeal, having already been appointed and confirmed to the Eastern District of Virginia.

stated that her children loved him and considered him as their father. Sarah was in a romantic relationship with Jose Giovanni Portillo Granados (Giovanni), a neighbor who lived on the second floor of her apartment building.

Sarah testified that, near the time of the incident, she did not "want anything to do with" appellant, who knew about her relationship with Giovanni and was angry about it. Sarah and appellant exchanged heated words about this relationship both verbally and in text messages.

Sarah had custody of A.G., and she stated that appellant did not want visitation with his child. On July 25, 2016, Sarah and appellant had a child custody and support hearing, where the court ordered appellant to pay Sarah $216 per month in child support for A.G. and $100 per month toward a $753 arrearage. After the hearing, appellant "begged" Sarah "to be with him." Sarah and appellant arranged to meet at her apartment on July 29, 2016, to discuss child support and for appellant to give her a child support payment.

Appellant arrived at Sarah's apartment with a twelve-pack of beer, roses, and a money order in the amount of $220. Sarah was upset because appellant did not bring the full amount of money he owed her - $316. Appellant had dinner with the family, and during dinner, appellant told C.M., whose birthday was the next day, that he was going to give him "the best birthday present ever." After dinner, appellant and Sarah had an argument about the amount of child support appellant gave her. Appellant took Sarah to a 7-11 store where he got another money order for $100 and gave it to Sarah. During the drive to 7-11, appellant was very angry about the child support and Sarah's relationship with Giovanni. Sarah stated that appellant was "driving me crazy."

Sarah and appellant returned to Sarah's apartment, and appellant entered the apartment long enough to retrieve the remaining beers from his 12-pack. Meanwhile, Sarah and appellant continued to verbally insult each other. After appellant left, he and Sarah exchanged a series of insulting text messages through the early morning hours of July 30, 2016, during which Sarah claimed to be "with" Giovanni now. Appellant texted Sarah that Giovanni did not "think that [appellant would] show up and kill [her] and him straight up." Appellant also threatened to "blow up" Sarah's car, and kill Sarah, Juan, and Giovanni. At 12:36 a.m. on July 30, 2016, Sarah sent appellant her last text message, "don't worry I've been home since u left me, hope you're out." Appellant continued to send text messages to Sarah and call her.

On July 30, 2016, at or about 12:45 a.m., Sarah had just gone to bed when she heard "a big boom outside." She ran outside and saw that Giovanni's vehicle and the vehicle parked next to it were on fire. When the police arrived at the scene, Sarah showed them her phone and told them about her recent interactions with appellant and his threats. The police told Sarah that appellant's cell phone had "pinged" in Charles Town, West Virginia, at 2:51 a.m. on July 30, 2016.

2

Sarah went back to bed at approximately 5 a.m. At about 8 a.m., Sarah took C.M. through her patio door to the outside of her apartment to look at the burned vehicles, while her daughters remained inside the apartment. While they were on the patio, Sarah saw appellant walking toward her from the parking lot. When she saw appellant, she shouted at Giovanni and his brother, who were in the parking lot looking at the burnt vehicles, to call 911. Appellant started walking faster and yelled, "oh, you're going to call the fucking police," and he "charg[ed]" at Sarah. Sarah and C.M. quickly entered the apartment and locked the sliding glass door. Appellant kicked and punched the sliding glass door with his hands and feet. He then took a grill and threw it through the sliding glass door.

Sarah testified that appellant entered the apartment through the broken sliding glass door and pursued her to an area near the kitchen. He pulled a knife out of his right front pocket, said, "I'm going to fucking kill you fucking bitch," and started stabbing her in front of her children. After appellant stabbed her several times, Juan, who had been in the bedroom, jumped on appellant's back and told Sarah to run. Sarah did not see a knife or anything in Juan's hand. Sarah ran out of the broken sliding glass door into the parking lot where she begged for help. Sarah was stabbed in the torso, chest, back, and left elbow.

After Sarah ran out of her apartment, appellant came out of the apartment through the sliding glass door and chased her. Appellant's eyeball was on his cheek, and he had a knife. Sarah ran to Giovanni who was still in the parking lot. Sarah stated that Giovanni told appellant to "come at" him, and while "they were going at each other," Sarah saw Juan exit the apartment and collapse. Sarah got into another one of Giovanni's cars and started to pass out. After the incident, Sarah was hospitalized for about one week and has numerous scars from the stabbings. Juan died as a result of his injuries.

C.M. testified that when he was outside with Sarah, he saw appellant walking across the parking lot, carrying a knife in his hand. He also stated that he saw appellant remove a knife from his pocket when appellant was inside the apartment. C.M. did not see appellant stab Sarah, but he saw appellant stab Juan.

C.M. also saw Juan jump on appellant's back, but he did not know if Juan had anything in his hands when he did this.

A.M. testified that when appellant entered the apartment, he removed a knife from his pocket and stabbed Sarah. A.M. awoke Juan who told the children to run.

Catalino Ruano Hernandez lived in Sarah's apartment building. He testified that on July 30, 2016, at about 7:30 a.m., he had exited his apartment to go to work when he saw appellant throw a grill at Sarah's sliding glass door and enter her apartment with a knife in his right hand. Hernandez, who works in a restaurant, indicated the size of the knife in court, said that it was a knife "used in kitchens," and stated that the handle was wrapped in plastic. Hernandez saw appellant and Sarah grabbing each other and appellant tried to "harm" her. He then saw someone

3

wearing shorts, Juan, come out of the bedroom and try to "defend" Sarah. Hernandez testified that Juan "had nothing in his hands" and that appellant stabbed Juan in his chest. Hernandez stated that when Sarah fled the apartment, appellant followed her, carrying "a different knife" but Hernandez could not see what type of knife it was. He stated that Juan, who was then carrying the knife with the plastic on the handle, tried to follow appellant, however he did not walk far and fell to the ground. Appellant got into a blue Toyota vehicle and drove away.

When Prince William County Police Sergeant Ramos arrived at the crime scene, another officer was trying to give aid to Juan, and Sarah was lying on the ground. Ramos saw that Juan was stabbed in the middle of his chest. Close to Juan's body, Ramos saw "a large silver-handled and silver-blade kitchen knife, pretty large knife. It has plastic wrap around the handle."

On the morning of July 30. 2016, Prince William County Police Officer Tommy Jones received a be-on-the-lookout for the vehicle that appellant was driving, and he located the vehicle on the shoulder of Interstate 66, not far from Sarah's apartment. Appellant was outside the vehicle, bloodied and waving for help. Jones stated that appellant's eye "was gone," but "a piece of his eye [was] in the socket." Appellant had numerous stab wounds, including one on the back of his head.

A knife was on the passenger's seat of appellant's vehicle. Jones asked appellant who had injured him, and appellant replied something about "baby's momma." Jones asked if his "baby's momma" had caused his injuries, and appellant replied, "I kill that bitch." Jones stated that he was unsure whether appellant meant past or future tense, but he heard the word "kill." Prince William Police Sergeant Curtis Wallace testified that he heard appellant say, "I will kill that bitch." Appellant was driving a vehicle registered to his mother, and law enforcement recovered appellant's passport from the driver's seat of the vehicle and a knife and sheath from the passenger's seat.

Kelly Loynes, a DNA forensic scientist, analyzed two areas of the smaller knife found in appellants vehicle. From blood taken from the upper portion of the handle of this knife, Sarah and Juan were eliminated as major contributors to the DNA mixture profile, but appellant could not be eliminated as a major contributor. From a representative blood sample taken from the blade of this knife, Sarah was eliminated as a contributor to the DNA mixture profile but appellant and Juan could not be eliminated as contributors to the DNA mixture profile.

Loynes swabbed three areas of the larger knife found next to Juan's body. From a representative sample from the blade area, Sarah was eliminated as a contributor to the DNA mixture profile, but Juan and appellant could not be eliminated. From blood identified on the plastic on the handle area, Juan could not be eliminated as a major contributor to the DNA mixture profile and appellant could not be eliminated as a minor contributor to the DNA mixture profile. Sarah was eliminated as a contributor to this DNA profile. From a swab taken from the plastic on the

4

>   base of the knife handle, Sarah and appellant were eliminated as contributors, but Juan could not be eliminated as a contributor to the DNA profile.
>
>   Dr. Meghan Kessler, Assistant Chief Medical Examiner, testified that Juan had one stab wound to his left-mid chest that was two and one-half inches deep and put a hole in his heart. He also had a few abrasions on his head, chest, left elbow, right side, and left knee. She opined that the knife recovered from appellant's vehicle was compatible with Juan's stab wound.

Dkt. 2 at 3-7; Dkt. 8 at 3-7; Dkt. 8-3 at 1-6.

In February 2018, following a jury trial, Petitioner was found guilty of second-degree murder, aggravated malicious wounding, and statutory burglary. Dkts. 8-1, 8-2. He was then sentenced to: (i) 40 years for the second-degree murder conviction; (ii) 60 years for the malicious wounding conviction; and (iii) life for the statutory burglary conviction. *Id.* The sentences were to run consecutively to all other sentences. *Id.*

Petitioner appealed arguing that: (i) the circuit court abused its discretion in refusing an instruction on voluntary manslaughter; (ii) there was insufficient evidence of statutory burglary; and (iii) the circuit court erred when it denied his motion for a new trial and motion for reconsideration based on recusal. Dkt. 8-3. On September 8, 2020, the Court of Appeals of Virginia denied the appeal *per curiam*. *Id.* On December 18, 2020, a three-judge panel affirmed the denial of the appeal. Dkt. 8-4. After appealing to the Supreme Court of Virginia, on August 30, 2021, the Supreme Court of Virginia refused the appeal. Dkt. 8-5.

On August 22, 2022, proceeding *pro se*, Petitioner timely filed a petition for a writ of habeas corpus in the Circuit Court of Prince William County asserting eight claims of ineffective assistance of counsel. Dkt. 8-6. On May 3, 2023, the circuit court dismissed the petition. *Id.* Petitioner appealed to the Supreme Court of Virginia, which refused the appeal. Dkt. 8-7.

On March 8, 2024, Petitioner, represented by counsel, timely filed a petition pursuant to 28 U.S.C. § 2254. Dkt. 1. In the Petition, he argues that the state court erred in failing to find:

5

(i) ineffective assistance of counsel based on an alleged failure to conduct pretrial investigation; (ii) ineffective assistance of counsel for stipulating to photographs of Petitioner, because such stipulation prevented Petitioner from testifying in his own defense; (iii) ineffective assistance of counsel for advising that Petitioner proceed with by jury rather than judge; (iv) ineffective assistance of counsel for failing to impeach the testimony of two juvenile witnesses; (v) ineffective assistance of counsel for failing to argue heat of passion; (vi) ineffective assistance of counsel for failing to move to recuse the trial judge. Dkt. 2.

On October 16, 2024, the Court issued an Order directing Respondent to file a response to the Petition. Dkt. 4. The Court further directed that, if Respondent filed a Motion, the parties were to consult regarding a proposed briefing scheduled. *Id.*

On November 13, 2024, Respondent timely filed a Motion and Rule 5 Answer. Dkts. 6-8. On June 11, 2025, Respondent notified the Court that Petitioner had indicated, by counsel, that he would not respond to the Motion. Dkt. 10. Respondent also waived hearing on the Motion. *Id.*

## II. STANDARD OF REVIEW

Habeas corpus in federal court exists to "guard against extreme malfunctions in the state criminal justice systems." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citation and internal quotation marks omitted). Federal habeas is neither an alternative to state-court relief nor an additional chance to appeal erroneous state-court rulings. *See id.* That preference for, and deference to, state courts is borne out in the various constraints placed on federal courts. *See Shoop v. Hill*, 586 U.S. 45, 47 (2019) (*per curiam*). "In disposing of a § 2254 habeas corpus petition" federal courts are "substantially constrain[ed]" in their review of state court convictions by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Wolfe v. Johnson*, 565 F.3d 140, 159 (4th Cir. 2009). AEDPA was "designed to further the principles of comity, finality, and

federalism" by limiting federal habeas proceedings. *Sharpe v. Bell,* 593 F.3d 372, 379 (4th Cir.2010) (quotation marks omitted). Accordingly, if a state court adjudicates a petitioner's claims on the merits, a federal court may only award habeas relief if the resulting state court decision "[i]s contrary to or involved an unreasonable application of federal law" or "[i]s based on an unreasonable determination of the facts in light of the evidence" that was before it. 28 U.S.C. § 2254(d). "A state court's decision is 'contrary to' clearly established federal law only if it is 'substantially different' from the relevant Supreme Court precedent; it is 'an unreasonable application of' clearly established federal law only if it is 'objectively unreasonable.'" *Wolfe,* 565 F.3d at 159 (quoting *Williams v. Taylor,* 529 U.S. 362, 405, 409 (2000)).

A state prisoner must exhaust his remedies in state court before seeking habeas corpus relief in federal court. 28 U.S.C. § 2254(b). The exhaustion requirement is satisfied by a finding that the "essential legal theories and factual allegations advanced in federal court [are] the same as those advanced at least once to the highest state court." *Pruett v. Thompson*, 771 F. Supp. 1428, 1436 (E.D. Va. 1991). This means that both the same argument and factual support must be presented to the state court prior to entry into federal court. *Anderson v. Harless*, 459 U.S. 4, 6-7 (1982). "As a general rule, in the absence of 'exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent,' *Bowen v. Johnston*, 306 U.S. 19, 27 (1939) (italics in original), courts 'require[] exhaustion of alternative remedies before a prisoner can seek federal habeas relief.'" *Timms v. Johns*, 627 F.3d 525, 530–31 (4th Cir. 2010) (alteration in original) (parallel citation omitted) (quoting *Boumediene v. Bush*, 553 U.S. 723, 793 (2008)).

Further, a federal court ordinarily may not consider claims that a petitioner failed to raise at the time and in the manner required under state law unless "the prisoner demonstrates cause for the default and prejudice from the asserted error." *House v. Bell,* 547 U.S. 518, 536 (2006).

7

Typically, "[t]he ineffectiveness or incompetence of counsel during [f]ederal or [s]tate collateral post-conviction proceedings" is not a ground for relief under § 2254. 28 U.S.C. § 2254(i); *see also Martinez v. Ryan*, 566 U.S. 1, 9 (2012) ("[A]n attorney's ignorance or inadvertence in a [post-conviction relief] proceeding does not qualify as cause to excuse a procedural default."). In *Martinez*, however, the Supreme Court created a narrow exception permitting inadequate assistance of counsel at initial-review collateral proceedings to establish cause for a procedurally defaulted claim of ineffective assistance of trial counsel where:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective-assistance-of-counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (alteration in original) (quoting *Martinez*, 566 U.S. at 14–16).

Where a petitioner argues ineffective assistance of counsel, the standard for attorney performance is one of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A judge must determine "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. To demonstrate ineffective assistance, a petitioner must show both that counsel's conduct was deficient and that the deficient performance prejudiced the defense. *Id.* at 687. The evaluation of the counsel's performance must be "highly deferential." *Umar v. United States*, 161 F. Supp. 3d 366, 375 (E.D. Va. 2015). Such a showing must go beyond establishing that counsel's performance was below average, since "effective representation is not synonymous with errorless representation." *Springer v. Collins*, 586 F.2d 329, 332 (4th Cir. 1978) (citation omitted); *see also Strickland*, 466 U.S. at 687–91. Only in "relatively rare situations" will

8

a Section 2255 motion establish that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Tice v. Johnson*, 647 F.3d 87, 102 (4th Cir. 2011) (quoting *Strickland*, 466 U.S. at 690).

### III. ANALYSIS

Although the Motion stands unopposed, out of an abundance of caution, the Court will address the arguments raised by the Motion. For the reasons discussed below, the Motion will be granted.

#### A. Exhaustion and Procedural Default

Respondent concedes that the first five ineffective assistance of counsel claims raised by Petitioner are exhausted because they were raised to the Supreme Court of Virginia. Dkt. 8 at 8. Respondent argues that Claim VI – ineffective assistance of counsel for failing to move to recuse the trial judge – is raised for the first time in Petitioner's Section 2254 Petition. *Id.* Petitioner appears to concede as much in his Memorandum in Support of his Petition. Dkt. 2 at 23. Because Claim VI was not presented to the Supreme Court of Virginia originally and because Petitioner is now precluded from doing so, Claim VI is simultaneously technically exhausted and procedurally defaulted. *See* Va. Code § 8.01-654(A)(2) (requiring state habeas petitions be filed within two years of final judgment or one year of direct review process); Va. Code § 8.01-654(B)(2) (generally requiring petitioner to file one petition); *see also Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (stating that a claim is "technically" exhausted if "a state procedural rule would bar consideration if the claim was later presented to the state court"). Review of Claim VI is thus precluded unless Petitioner can show cause and prejudice. *House*, 547 U.S. at 536.

Here, Petitioner attempts to demonstrate cause and prejudice in just two sentences. Dkt. 2 at 23 ("To the extent this court [sic] finds that this claim was procedurally defaulted by Gaitans'

9

[sic] failure to exhaust the claim in state court, Gaitan filed his state court habeas *pro se*. *Martinez v. Ryan*, 566 U.S. 1 (2012) allows claims to be raised in federal court that may be subject to procedural default due to a petitioner acting *pro se* in state court."). As the Fourth Circuit has noted, *Martinez* carries with it a "high procedural bar." *Owns v. Stirling*, 967 F.3d 396, 403 (4th Cir. 2020). And, to successfully over the come procedural default in reliance on *Martinez*, Petitioner must show that his ineffective assistance of counsel claim was "substantial." *Id.* (emphasis in original). Petitioner has not met that burden here.

Claim VI rests on Petitioner's assertion that his counsel should have moved to recuse Prince William County Circuit Judge Kimberly Irving earlier in the proceedings. Dkt. 2 at 22. As the Court of Appeals of Virginia recounted, prior to trial, Petitioner apparently paid a fee to Judge Irving's husband, John Irving, for a legal consultation about the case. Dkt. 8-3 at 9. About six months after trial, Petitioner's counsel filed to have Judge Irving recuse herself, which she did on June 27, 2018; in so doing, Judge Irving noted that the issue was "never raised [at trial]" and that it is "a relatively well known fact to the bar that [she and her husband] don't discuss cases." *Id.* In a separate hearing, it was developed that Mr. Irving had received a payment of $500 and had met with Petitioner for approximately one hour to ninety minutes and had two other brief interactions with him. *Id.* Mr. Irving also indicated that he was "fairly confident" that he had discussed the potential conflict with Petitioner and that he never discussed the case with Judge Irving. *Id.* Petitioner's trial counsel also testified at the subsequent hearing that "he did not bring to Judge Irving's attention" the potential issue because "he did not know" about Petitioner's consultation with Mr. Irving. *Id.* In ruling on a motion to dismiss based on the alleged conflict, the judge who replaced Judge Irving on the case, Judge Tracy C. Hudson, held as follows: (i) that Mr. Irving gave Petitioner enough information to recognize the alleged conflict; (ii) at the time of

the trial, Petitioner was the only person who knew of this potential conflict, yet kept the information to himself; and (iii) "the mere marital status of the judge and an attorney with whom the defendant consulted at some point months prior to trial . . . certainly does not constitute an extrajudicial influence." *Id.*

Petitioner fails to show a substantial claim under *Strickland*. Petitioner does not allege that Judge Irving knew of the brief relationship between Mr. Irving and himself or that Judge Irving was actually biased against him. Rather, Petitioner recites – in contradiction to the findings of Judge Hudson -- that he informed his trial counsel of his consultation with Mr. Irving. Dkt. 2 at 22. This allegation is unsupported by any statement by Petitioner and, again, contradicts the findings of Judge Hudson and the Court of Appeals of Virginia. Dkt. 8-3 at 11-12. Thus, Petitioner has failed to demonstrate a substantial claim where (i) the record demonstrates that trial counsel could not be ineffective for failing to raise an issue whose province was solely within the knowledge of Petitioner; and (ii) the record fails to demonstrate prejudice, because Petitioner fails to allege that the potential conflict effected his trial in any way. Indeed, Petitioner himself describes the conflict as "potential." Dkt. 2 at 22. Other courts have also denied Section 2254 petitions on similar grounds. *See e.g.*, *Buddenhagen v. Pryor*, 2016 WL 6267910, at *10 (D. Kan. Oct. 26, 2016) (rejecting habeas claim where "Petitioner still alleges no facts showing that Judge Wachter was aware of any significant conflict of interest and even states that he was unaware of this relationship until long after trial"); *cf. Vaughn v. Rawski*, 2015 WL 3916956, at *7 (D.S.C. June 25, 2016) (rejecting habeas claim based on trial counsel's alleged conflict where the petitioner was the only one aware of the alleged conflict). Accordingly, because Petitioner's ineffective

11

assistance claim is not substantial, Claim VI remains procedurally defaulted and will be denied and dismissed on that ground.[3]

### B. Claims of Ineffective Assistance of Counsel

Petitioner's remaining claims of ineffective assistance of counsel are exhausted but meritless. The Court examines each of Petitioner's arguments in this regard below.

#### i. *Claim I*

In Claim I, Petitioner alleges that the state court erred in failing to find that trial counsel was ineffective for failing to conduct a pretrial investigation. Dkt. 2 at 11. To that end, Petitioner conclusorily alleges that "a proper investigation would have yielded witnesses supporting a defense impeaching the Commonwealth's evidence that Gaitan broke into the apartment and initiated an unprovoked attack." *Id.* at 13. Petitioner identifies no such witnesses or evidence that would have been uncovered.

To begin with, the state habeas court rejected Petitioner's claim because, during a pretrial colloquy, Petitioner conceded that he had discussed potential defenses with his counsel, that defense witnesses were present, that he was satisfied with the services of his counsel, and that he was ready for trial. Dkt. 8-6 at 10. The state habeas court found that such declarations "carry a strong presumption of verity." *Id.* Furthermore, the state habeas court found that Petitioner's claim failed because he could not establish prejudice – that is, he could not demonstrate any effect on the outcome of the trial. *Id.* The state habeas court's rulings in this regard are not contrary to or an unreasonable application of the law. As courts in this Circuit routinely recognize, claims of ineffective assistance of counsel that are "supported by mere 'vague and conclusory allegations'

---

[3] This conclusion is compelled by the record in this case and case authority, but the Court is, of course, hamstrung in this analysis by Petitioner's failure to respond to the arguments raised in the Motion to Dismiss.

are insufficient to carry a petitioner's burden under *Strickland*." *Bazemore v. United States*, 2024 WL 2136282, at *3 (E.D. Va. May 13, 2024); *see also United States v. Dyess*, 730 F.3d 354, 359, 365 (4th Cir. 2013) (emphasizing that "vague and conclusory allegations contained in a [habeas] petition may be disposed of without further investigation by the District Court," and finding no merit to a claim of ineffective assistance where the petitioner offered "nothing more than speculative conclusions in explaining who [defense] counsel failed to call and what aid their testimony would have provided to [the petitioner's] case"). Here, as at the state habeas level, the Petition contains nothing more than vague assertions regarding the alleged failure to investigate and identifies no specific witness or evidence that further investigation would have revealed nor why such evidence would have been likely to lead to a different result. Thus, the state habeas court reasonably determined that Petitioner failed to satisfy the second *Strickland* prong. Accordingly, Claim I is denied and dismissed.

ii.  *Claim II*

In Claim II, Petitioner asserts that the state habeas court erred in failing to find that trial counsel was ineffective for stipulating to the introduction of photographs showing Petitioner with various stab wounds. Dkt. 2 at 14. He argues that the introduction of the photographs prevented him from testifying in his own defense. *Id.* He further asserts that counsel "unduly influenced Gaitan out of exercising his right to testify [on] his own behalf." *Id.* The state habeas court reasonably rejected these arguments, finding that Petitioner "failed to demonstrate how his attorney's stipulations were unreasonable or how the agreements prevented him from testifying in his own defense." Dkt. 8-6 at 12. This Court agrees.

To begin with, Petitioner has failed to demonstrate any prejudice resulting from counsel's stipulation to the admission of certain photographs where Petitioner does not assert that the

13

photographs were otherwise inadmissible. If the photographs were otherwise admissible (as it appears they were), Petitioner can show no prejudice from his counsel's decision to stipulate to such admission. *See Morva v. Zook*, 821 F.3d 517, 533 (4th Cir. 2016) ("It is not objectively unreasonable for counsel to stipulate to a fact that the government can prove."). In that regard, trial counsel's decision to stipulate to the admission of such photographs is a decision that "primarily involves trial strategy and tactics." *Thomas v. Clarke*, 2020 WL 4690353, at *14 (E.D. Va. June 30, 2020) (citing cases and rejecting habeas claim where decision to stipulate was "a trial strategy that falls within Defense Counsel's control"). Thus, the state habeas court did not err in rejecting Petitioner's claim in this regard.

The state habeas court also reasonably rejected Petitioner's assertion that counsel's actions prevented Petitioner from testifying in his own defense. Dkt. 8-6 at 13. As the state habeas court correctly noted, Petitioner has failed to establish prejudice because he cannot show that his failure to testify altered the trial's outcome. *United States v. Powell*, 134 F.4th 222, 230-31 (4th Cir. 2025) (holding that "the likelihood of a different result must be substantial, not just conceivable"). Further, Petitioner's claim is essentially that his counsel advised him not to testify. Petitioner "has failed to show how his attorney's advice, similar to the advice offered in most criminal cases, fell below an objective standard of reasonableness." *McQueen v. United States*, 2016 WL 413090, at *6 (E.D.N.C. Feb. 2, 2016). Accordingly, Petitioner's Claim II fails and will be denied and dismissed.

iii.     *Claim III*

In Claim III, Petitioner asserts that the state habeas court erred in failing to find that trial counsel was ineffective for advising that Petitioner proceed with a jury trial over a judge trial. Dkt. 2 at 17. Petitioner asserts that, because this case involved testimony by minor witnesses, competent

counsel would have advised that Petitioner be tried by a judge over a jury. *Id.* at 18. Petitioner's claim fails because the state habeas court reasonably determined that Petitioner has failed to demonstrate prejudice such that the result of the case would have been different if tried to a judge. *See United States v. Dailey*, 2013 WL 1768053, at *9 (E.D. Va. Apr. 24, 2003) (rejecting habeas claim based on advice to pursue a bench trial where nothing in the record that demonstrated prejudice from that decision). Accordingly, Petitioner fails to demonstrate that the state habeas decision was contrary to or an unreasonable application of the law and, thus, Claim III will be denied and dismissed.

### iv.     *Claim IV*

In Claim IV, Petitioner asserts that the state habeas court erred in failing to find that trial counsel was ineffective for failing to impeach the testimony of two juvenile witnesses. Dkt. 2 at 18. To begin with, the state habeas court reasonably determined that the decision not to impeach two minor witnesses was a reasonable tactical decision given the optics to the jury. Dkt. 8-6 at 18. Other courts have recognized that counsel are not ineffective in declining – as a matter of strategy – to cross-examine sympathetic witnesses. *See Chavez v. Uttecht*, 2020 WL 2113768, at *2 (W.D. Wash. May 4, 2020) (rejecting habeas claim and recognizing "it is reasonable that Petitioner's counsel saw no merit in aggressively cross-examining a ten-year-old victim who was likely sympathetic to the jury"); *Howard v. McNeil*, 2008 WL 4279680, at *10 (M.D. Fla. Sept. 16, 2008) (rejecting habeas claim where "Jury might perceive his efforts to impeach Gossett as an attack on a sympathetic victim, which would not be in his client's best interest"); *Harris v. Thaler*, 2010 WL 2991084, at *11 (S.D. Tex. July 27, 2010) (rejecting habeas claim based on a failure to impeach a sympathetic witness). Moreover, Petitioner does not address or correct the deficiency noted by the state habeas court that Petitioner failed to identify what impeachment his counsel failed to pursue.

Dkt. 8-6 at 18. Without more specific information regarding what impeachment trial counsel purportedly failed to conduct, Petitioner has failed to establish that trial counsel was ineffective. Accordingly, Claim IV will be denied and dismissed.

v. *Claim V*

In Petitioner's final claim, Claim V, Petitioner argues that the state habeas court erred in failing to find trial counsel ineffective for not arguing heat of passion. Dkt. 2 at 20. As the state habeas court reasonably held, Petitioner's claim failed because Petitioner offered "no reference to any evidence in the record that could be used for his attorney to make that argument." Dkt. 8-6 at 19. This is especially true where the Court of Appeals of Virginia held that "no evidence showed that appellant acted in mutual combat or had been reasonably provoked when he killed Juan." Dkt. 8-3 at 7. Petitioner fails to point to any evidence in the record that supports that he was defending himself. Instead, Petitioner vaguely argues "that he was defending himself" and that "[e]vidence collected at the scene indicated more than one attacker in this incident." Dkt. 2 at 21. Petitioner fails to identify any such evidence and, in any event, as the Court of Appeals of Virginia recounted: "None of the witnesses testified that they saw Juan in possession of any weapon when he jumped on appellant's back. Juan jumped on appellant's back to try to stop appellant's knife attack on Sarah." Dkt. 8-3 at 7; *Hargrove v. Solomon*, 227 F. App'x 806, 809 (11th Cir. 2007) (rejecting habeas claim based on failure to argue heat of passion and holding: "The state court's decision – that Petitioner was not denied effective assistance of appellate counsel – resolved a question of what jury instructions were proper under state law. Since Petitioner has not shown that that decision was otherwise contrary to, or an unreasonable application of, relevant Supreme Court precedent governing claims of ineffective assistance of counsel, we must affirm the district court's denial of the writ."). Petitioner cannot show that trial counsel was ineffective in failing to argue

16

what the Court of Appeals of Virginia has held would be inappropriate under the law. Accordingly, Claim V fails and will be denied and dismissed.

IV.  CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." R. 11(a), Rules Governing Section 2254 Cases U.S. District Courts; *see also* 28 U.S.C. § 2253(c)(1)(A) (prohibiting an appeal to the respective court of appeals from a final order concerning a habeas corpus petition "[u]nless a circuit justice or judge issues a certificate of appealability"). A certificate of appealability ("COA") will not issue absent "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). For the reasons stated above, the Court has reviewed the record and concluded that Petitioner has not made the requisite showing with regard to these claims. Accordingly, the Court denies a COA for each of Petitioner's claims and dismisses this Petition.

V. CONCLUSION

In sum, for each of his exhausted claims Petitioner fails to demonstrate that the state habeas court's application of *Strickland* was contrary to or an unreasonable application of the law. Moreover, for most of Petitioner's claims, Petitioner fails to show any prejudice resulting from the claimed errors of trial counsel and, in some instances, fails to persuade that trial counsel was in

17

any way deficient. For the foregoing reasons, it is hereby ORDERED that the Motion to Dismiss (Dkt. 6), which was not opposed by Petitioner, is GRANTED; and it is

FURTHER ORDERED that the Petition (Dkt. 1) is DENIED AND DISMISSED; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
June 24, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge